UNITED STATES of America,
Appellee,

v.

Fred SNOW, Marcus Snow, Rahad Ross, Defendants–Appellants.

Docket Nos. 05–0958–CR(L), 05–1850–CR–(CON), 05–2208(CON).

United States Court of Appeals, Second Circuit.

Argued: Feb. 6, 2006.

Decided: Sept. 1, 2006.

Bradley E. Tyler, Assistant United States Attorney, Western District of New York, for Appellee.

Bruce Harvey, Law Office of Bruce Harvey, for Defendant–Appellant Marcus Snow; Jeffrey Wicks, Law Office of Jeffrey Wicks, for Defendant–Appellant Fred Snow; Robert Wood, Law Office of Robert W. Wood, for Defendant–Appellant Rahad Ross.

Before JACOBS, POOLER, and JOHN R. GIBSON,* Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

A jury convicted Marcus Snow, Fred Snow, and Rahad Ross in connection with a narcotics trafficking operation in Rochester, New York. Rahad Ross appeals his convictions, Fred Snow appeals his sentence, and Marcus Snow appeals both. For the following reasons, we affirm.

---

* The Honorable John R. Gibson, Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

Because the sufficiency of the evidence is in issue, we set forth the facts in the light most favorable to the government, drawing all reasonable inferences in its favor. *United States v. Morgan*, 385 F.3d 196, 198 (2d Cir.2004). In September 2001, members of the Rochester Police Department's Violent Crime Team received information from a confidential informant that Marcus Snow and his associates were selling cocaine and cocaine base out of three apartments on Sixth Street in Rochester. According to the informant, members of the trafficking organization would cut and package drugs at 183 Sixth Street, store the packaged drugs at 188 Sixth Street, and then sell the narcotics to customers out of an apartment at 190 Sixth Street.

Based on this information, police conducted a series of controlled buys with a confidential informant, Donnie Brown. During the first buy, Brown met with Fred Snow at 190 Sixth Street and asked him for an eight-ball of cocaine; Snow retrieved the desired quantity from 188 Sixth Street. During the second buy, Brown ordered an eight-ball of cocaine from Rahad Ross, who sent Fred Snow out with a set of keys to fetch the order; Snow returned with the cocaine and gave it to Brown in exchange for $170, which Snow handed over to Ross, who put the money in his pocket. In the third controlled buy, an individual known as "J.T." sold Brown an eight-ball for $170. During the last controlled buy, Brown ordered an eight-ball of cocaine from Fred Snow, who gave a key to Ronnie Parsons to retrieve the order; Parsons left out the front door and returned moments later with a package of cocaine for Brown.

Shortly after the last controlled buy, Rochester police learned that an officer from a nearby city had searched Marcus Snow's vehicle in connection with a traffic violation and had uncovered $2,044 in cash proceeds and various utility bills connecting him to the apartments at 183 and 190 Sixth Street. Based on the information gathered during the traffic stop and the controlled buys, as well as through interviews with other confidential informants, officers secured four "no-knock" search warrants from a Monroe County Court judge, which they executed on January 11, 2002.

After officers entered 183 Sixth Street and announced their identity as police, a man, later identified as Charles Snow, jumped out of a front window and onto the lawn. Officers apprehended two other men, Anthony Moore and Rahad Ross, fleeing from the back of the house, neither wearing a coat, and one without shoes. A search of Marcus Snow's Chevrolet Corsica parked outside uncovered a plastic bag containing smaller baggies with yellow markings. Inside the green Acura in the driveway, officers found letters addressed to Marcus Snow and a prescription medicine bottle with his name on it.

Inside 183 Sixth Street officers found drugs, drug paraphernalia, guns, and cash. In the kitchen cabinets, police found three scales, balloons, boxes of sandwich bags, and plastic bags holding hundreds of smaller plastic baggies with yellow markings; in the kitchen sink, officers found a plate holding "small-type white rocks" later determined to be cocaine. In the bedroom directly off the kitchen, officers found a bottle of Procaine,[1] a box of sandwich bags, and photographs of Rahad Ross and Marcus Snow on top of a dresser.

---

1. According to witness testimony, Procaine is a product used to "expand crack" in order to make it weigh more.

Inside the dresser officers found two loaded handguns in a dresser, one of which was in the same drawer as $6,000 in cash. In the basement, police found 180 baggies containing approximately 474 grams of crack cocaine stashed inside a towel.

While police searched 183 Sixth Street, officers were also executing search warrants at the other two apartments. At 190 Sixth Street, officers encountered three men and one woman, later identified as John Turner a/k/a "J.T", Shawn Thomas, Ronald Parsons, and Sharon Robinson. They found two small baggies of marijuana and a partially burned marijuana cigarette. The apartment at 188 Sixth Street was empty of furniture and no one was inside. In the kitchen, officers found a box of rounds of .10 mm ammunition, a box with a digital scale, clear plastic bags with a razor blade, a digital scale case, and a micro ziplock bag containing a substance believed to be cocaine.

A federal grand jury handed down a multi-count indictment charging Marcus Snow, Fred Snow, and Rahad Ross in connection with the raid on the Sixth Street apartments.[2] Among other motions (not relevant to this appeal), Marcus Snow sought to suppress the evidence seized at 183 Sixth Street pursuant to the no-knock search warrant. The magistrate judge denied Snow's motion, and, reviewing the record *de novo*, the district court affirmed the denial.

At trial, the government presented the testimony of unindicted co-conspirators Ron Keitt, Marzell Miller, Sherman Green, as well as Donnie Brown, the confidential informant who conducted the controlled buys. The jury also heard testimony from Oliver Jackson, the owner and landlord of 183 Sixth Street, and Nancy Salvato, the owner and landlord of 188 and 190 Sixth Street. Several police officers involved in the investigation of the drug activities at the Sixth Street apartments also testified at trial.[3]

Following the thirteen-day trial, the jury found the defendants guilty on all charges. The district court sentenced Fred Snow to concurrent terms of imprisonment of 135 months on each of Counts I, II, III, and IV. The district court sentenced Rahad Ross to concurrent sentences of 240 months on Count I and V and 168 months on Counts III and VI. The district court sentenced Marcus Snow to life imprisonment on Counts I and V, 240 months on Count VI, and 120 months on Count VIII,

2. Count I of the superseding indictment charged that, from January 1998 to January 2002, the three had participated in a conspiracy to possess with intent to distribute and to distribute cocaine base. 21 U.S.C. §§ 841(a)(1),841(b)(1)(A), and 846. Counts II, III, and IV charged Rahad Ross and Fred Snow with distributing cocaine base. 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Count V charged Marcus Snow and Rahad Ross with possessing with the intent to distribute 50 grams or more of cocaine base. 21 U.S.C. § 841(a)(1) and (b)(1)(A). Count VI charged Marcus Snow and Rahad Ross with opening and maintaining the premises at 183 Sixth Street for the purpose of manufacturing, distributing, and using cocaine base. 21 U.S.C. § 856(a)(1). Count VII charged Marcus Snow with the unlawful possession of two specifically described handguns after being convicted of a felony crime. 18 U.S.C. §§ 922(g)(1), 924(a)(2). Lastly, Count VIII charged Marcus Snow with possessing two specifically described handguns in furtherance of the drug trafficking crimes charged in Counts I, II, III, IV, V, and VI. 18 U.S.C. § 924(c)(1).

3. The district court also read into evidence stipulations that the firearms found at 183 Sixth Street functioned as intended and were the firearms identified in the indictment and as to the particular weight in grams of each drug exhibit entered into evidence and that each of the cocaine exhibits was in the "base" form.

to be served concurrently, plus an additional sixty months on Count VII.

Appellants raise a number of claims on appeal. Marcus Snow challenges the legality of the "no-knock warrant" executed at 183 Sixth Street, argues that there was insufficient evidence to support his conviction for possession of the two charged handguns in furtherance of a drug trafficking offense, argues that there was a "fatal variance" between the indicted drug conspiracy and the proof at trial, and advances several challenges to his sentence. Rahad Ross seeks reversal of his convictions on Counts I, V, and VI for insufficient evidence. Fred Snow challenges only his sentence, claiming that the district court erred in its drug quantity calculation. We address each claim in turn.

## I. MARCUS SNOW

### A. FAILURE TO KNOCK AND AN-NOUNCE

■ Marcus Snow argues that the district court erred by denying his motion to suppress physical evidence obtained pursuant to the search warrant for 183 Sixth Street because officers entered the apartment without first knocking and announcing their presence. Assuming *arguendo* that the officers violated the so-called "knock and announce rule," see *Wilson v. Arkansas,* 514 U.S. 927, 931–932, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995), Snow is not entitled to the exclusionary remedy he seeks following the United States Supreme Court's recent decision in *Hudson v. Mich-*

*igan,* —— U.S. ——, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006).

With the government conceding that officers executing a search warrant at the home of Booker Hudson had failed to knock and announce their presence before entering, the issue before the Court in *Hudson* was one of remedy: "whether violation of the 'knock and announce' rule requires the suppression of all evidence found in the search." *Id.* at 2162. The Court answered that question in the negative, holding that the strong medicine of suppression was inappropriate for an officer's failure to knock and announce.[4] Accordingly, the district court did not err in refusing to exclude the evidence seized at 183 Sixth Street.

### B. INSUFFICIENT EVIDENCE: POSSESSION "IN FURTHER-ANCE"

■ Marcus Snow challenges the sufficiency of the evidence in support of his conviction for possession of two specifically-described handguns in furtherance of the charged drug trafficking offenses. *See* 18 U.S.C. § 924(c)(1)(A). We review a challenge to the sufficiency of the evidence *de novo,* although the defendant bears a "heavy burden" to overturn a conviction on this ground. *United States v. Naiman,* 211 F.3d 40, 46 (2d Cir.2000). The burden is heavy, in part, because we view the evidence at trial in the light most favorable to the government, and we draw every inference in its favor. *Id.* So long as *any* rational trier of fact could have found the

---

4. The Court's reasoning for holding the exclusionary rule inapplicable to knock and announce violations was two-fold. First, it concluded that since the knock and announce rule was designed to "assure[ ] the opportunity to collect oneself before answering the door," and not to "prevent[ ] the government from seeing or taking evidence described in a warrant," a remedy aimed at protecting the

latter interest is inapplicable to the former. *Id.* at 2165. Second, the Court reasoned that the marginal societal benefit from application of the exclusionary rule to no-knock entries is far outweighed by the "grave adverse consequence that exclusion of relevant incriminating evidence always entails ..., amounting in many cases to a get-out-of-jail-free card." *Id.* at 2165–66.

essential elements of the crime beyond a reasonable doubt, the jury's verdict will stand. *Id.*

A person may be convicted under § 924(c)(1)(A) for "mere possession of a firearm" so long as "that possession is 'in furtherance' of a drug trafficking crime." *United States v. Lewter,* 402 F.3d 319, 321 (2d Cir.2005). Marcus Snow does not dispute that he possessed the handguns alleged in the indictment, since he does not challenge his conviction under § 922(g)(1) for being a felon in possession of these particular firearms.[5] At issue is whether there was sufficient evidence that he possessed the firearms "in furtherance" of the charged drug trafficking offenses. Snow argues that the evidence was insufficient, since it established "no more than that the guns were merely present where the Government alleged drug transactions to have taken place." We find this argument unpersuasive.

■ To be sure, Snow is correct that "the mere presence of a weapon at the scene of a drug crime, *without more,* is insufficient to prove that the gun was possessed 'in furtherance of' the drug crime." *United States v. Castillo,* 406 F.3d 806, 814 (7th Cir.2005)(emphasis in original); *see also United States v. Krouse,* 370 F.3d 965, 967 (9th Cir.2004); *United States v. Wahl,* 290 F.3d 370, 375 (D.C.Cir.2002); *United States v. Finley,* 245 F.3d 199, 203 (2d Cir.2001). Accordingly, the government cannot convict under § 924(c)(1)(A) by relying on the generalization that "any time a drug dealer possesses a gun, that possession is in furtherance, because drug dealers generally use guns to protect themselves and their drugs." *United States v. Ceballos–Torres,* 218 F.3d 409, 414–15 (5th Cir.2000). Instead, the government must establish the existence of a specific "nexus" between the charged firearm and the charged drug selling operation. *Finley,* 245 F.3d at 203.

■ Although courts look at a number of factors to determine whether such a nexus exists,[6] the ultimate question is whether the firearm "afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking." *Lewter,* 402 F.3d at 322. In answering this question, courts "distinguish between a gun on the premises which has no reasonable relationship to the drug possession and future distribution and a weapon that is present to further that possession." *Castillo,* 406 F.3d at 815. Thus, while no conviction would lie for a drug dealer's "innocent possession" of a firearm, *see United States v. Mackey,* 265 F.3d 457, 462 (6th Cir.2001); *Ceballos–Torres,* 218 F.3d at 415 (hypothesizing locked and inaccessible pistol used for "target shooting or in hunting game" to illustrate weapon not possessed "in furtherance"), a drug dealer may be punished under § 924(c)(1)(A) where the charged

---

5. Count VII, the felon-in-possession charge, and Count VIII, the possession-in-furtherance-of-a-drug-trafficking-crime charge, both alleged that Snow possessed a Smith & Wesson 10mm Semi–Automatic pistol, Model 1086, Serial No. TFJ8969 and a Freedom Arms .22 Mag revolver, Model "Casual's Improvement," Serial No. B18634. Police seized both weapons from dresser drawers in a bedroom at 183 Sixth Street.

6. Factors include:

the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found.

*Ceballos–Torres,* 218 F.3d at 414–15; *see also United States v. Lomax,* 293 F.3d 701, 705 (4th Cir.2002) (applying factors); *Wahl,* 290 F.3d at 376 (same).

weapon is readily accessible to protect drugs, drug proceeds, or the drug dealer himself. *Lewter*, 402 F.3d at 322; *Castillo*, 406 F.3d at 816; *Mackey*, 265 F.3d at 462–63; *Ceballos–Torres*, 218 F.3d at 415. Undoubtedly, this is "a very fact-intensive question requiring a careful examination of, among other things, where the gun was located and what else was found in the apartment," and thus well-suited to resolution by a jury. *United States v. Taylor*, 18 F.3d 55, 58 (2d Cir.1994).

In light of the evidence presented at trial, we conclude that this is neither a "mere presence case," nor a case of mere "innocent possession." Police seized the charged firearms during their raid of the 183 Sixth Street apartment rented by Marcus Snow, where they also found 180 baggies containing approximately 474 grams of crack cocaine hidden in the basement. Officers found the two loaded handguns in a bedroom dresser, one in the top drawer and one in the middle drawer, the one in the top drawer next to $6,000 in cash. There was drug packaging paraphernalia in the bedroom's closet. Photographs taken by Officer Brennan at the scene depict the bedroom as being located directly off the apartment's kitchen, where officers found scales and baggies used in the packaging and sale of crack cocaine, as well as a plate containing trace amounts of "small-type white rocks" later determined to be cocaine.[7]

Viewing this evidence in the light most favorable to the verdict, a reasonable juror could conclude that Snow's possession of the handguns facilitated or advanced the instant drug trafficking offense by "protecting himself, his drugs, and his business." *Castillo*, 406 F.3d at 816.[8] Here, loaded handguns, illegally possessed, were found in the bedroom of an apartment where drugs were packaged and stored for sale. The guns were in close physical proximity to the paraphernalia used in the packaging and sale of crack cocaine and the trace amounts of illegal narcotics found in the kitchen. Moreover, the guns were found in the same dresser as $6,000 in cash, which a reasonable juror could conclude were drug proceeds. From the proximity between the handguns, proceeds, trace amounts of drugs, and drug paraphernalia, a reasonable juror could conclude that the "person to be protected was a drug dealer" and "drug packaging paraphernalia, and the proceeds of drug trafficking" were "among the things being protected." *Lewter*, 402 F.3d at 323.[9] Applying the deferential standard we must when reviewing the legal sufficiency of a jury's guilty verdict, we hold that this was sufficient evidence to support Snow's conviction under § 924(c)(1)(A).

7. Officer Brennan testified that the bedroom was "straight ahead" from the kitchen and that while standing in the apartment's kitchen, one could see the dresser where the firearms and cash were found.

8. *See also Mackey*, 265 F.3d at 462–63 (finding evidence of illegally-possessed, loaded, short-barreled shotgun in living room of crack house where it was easily accessible and near to drug paraphernalia sufficient to satisfy "in furtherance" requirement); *Ceballos–Torres*, 218 F.3d at 415 (holding evidence of illegally possessed, loaded, easily accessible weapon in defendant's apartment along with substantial amounts of drugs and money supported finding that gun protected drugs and money against robbery).

9. Undoubtedly, the layout of the apartment influenced the close physical proximity between the guns in the bedroom and the drug packaging paraphernalia in the adjacent kitchen. However, the other circumstances here, including that the $6,000 in cash was found next to the guns, persuade us that the jury could have inferred that this proximity was no accident, and instead was the result of Snow's deliberate choice, and therefore in furtherance of the drug trafficking activities conducted at the apartment.

## C. VARIANCE BETWEEN CHARGED CONSPIRACY AND PROOF

■ Marcus Snow challenges his conspiracy conviction on the ground that there was a "fatal" variance between the conspiracy charged in Count I of the superseding indictment and the proof at trial. We have previously recognized that a "variance error" is committed "[w]hen convictions have been obtained on the theory that all defendants were members of a single conspiracy although, in fact, the proof disclosed multiple conspiracies." *United States v. Johansen,* 56 F.3d 347, 350 (2d Cir.1995) (quoting *United States v. Bertolotti,* 529 F.2d 149, 154 (2d Cir.1975)). Here, we find no such variance.

As Snow concedes, there was absolutely no evidence at trial that he was incarcerated at any point during the alleged conspiracy; indeed, it was only in the presentence investigation report that it first came to light that Snow was incarcerated for ninety days during the four-year period of the charged conspiracy. Thus, there was no "proof at trial" from which the charged conspiracy could vary. However, even if evidence of this incarceration had been introduced at trial, it would not have proven the existence of multiple conspiracies, since this evidence, standing alone, would be insufficient to establish that Snow withdrew from the original conspiracy. *See United States v. Eisen,* 974 F.2d 246, 268–69 (2d Cir.1992). Finding no variance, fatal or otherwise, between the indicted conspiracy and that for which Snow was convicted, we affirm his conspiracy conviction.

## D. SENTENCING ISSUES

■ Marcus Snow raises three challenges to his sentence. The district court sentenced him to life imprisonment on Counts I and V, 240 months on Count VI, and 120 months on Count VIII, all to be served concurrently, plus an additional 60 months on Count VII to be served consecutively to the sentence imposed on Counts I, V, VI, and VIII. The district court imposed this sentence after considering the applicable guidelines range, the facts and circumstances surrounding the offenses, the applicable statutory maximums, and the factors set out in 18 U.S.C. § 3553(a). Snow argues that his sentence violates the Sixth Amendment because it was based on the judge-found fact that he had previously been convicted of a "felony drug offense." *See* 21 U.S.C. § 841(b)(1)(A). Snow argues that the Sixth Amendment required the jury to make this finding beyond a reasonable doubt.

We addressed a similar argument in *United States v. Estrada,* 428 F.3d 387 (2d Cir.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 1451, 164 L.Ed.2d 148 (2006). There, we joined the Third, Seventh, Eighth, and Tenth Circuits "in rejecting a claim that, after *Booker,* prior felony drug offenses are an element of the crime under § 841(b)(1)(A)." 428 F.3d at 391 (collecting cases). Accordingly, we held that judicial fact-finding that resulted in an increased mandatory minimum, but did not "increase the penalty *beyond* the prescribed statutory maximum," raised no Sixth Amendment concerns. *Id.* at 390 (quoting *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)(emphasis in original); *see also United States v. Snype,* 441 F.3d 119, 148 (2d Cir.2006) (finding no Sixth Amendment error in district court finding defendant's state robbery conviction was "serious violent felony" under § 3559(c)(1)(A))).

Like the judicial fact-finding at issue in *Estrada,* the district court's finding that Snow had previously been convicted of a "felony drug offense", despite subjecting him to an increased statutory *minimum,* was irrelevant to "the statutory *maximum*

of life imprisonment," since that maximum "remains constant" regardless of whether or not the government proved that he had been previously convicted of a felony drug offense. *Estrada*, 428 F.3d at 389. Consequently, the district court's factual finding on this issue does not implicate the Sixth Amendment. *Id.*[10]

■ Snow raises an additional Sixth Amendment argument with respect to his life sentence on Counts I and V. On these counts, the jury found Snow guilty of drug offenses involving 50 or more grams of "cocaine base." At sentencing, the district court found by a preponderance of the evidence that Marcus Snow was responsible for 12.5 kilograms of "cocaine base," which set his offense level at 38, and imposed a sentence of life imprisonment. See U.S.S.G. § 2D1.1(c)(1) (2002).

■ Snow argues that this sentence violated his Sixth Amendment rights because it was premised on the judge-found fact that the particular type of "cocaine base" for which he was responsible was "crack cocaine." Snow argues that the court could not set his offense level at 38 and impose a corresponding life sentence, absent a jury finding that he was specifically involved in trafficking "crack cocaine," as required to qualify as "cocaine base" under the drug quantity table of the sentencing guidelines. *See* Application note D to Guideline § 2D1.1(c) (2002) (defining "cocaine base" as "crack"). Snow's argument ignores the fact that the jury's finding that the drug involved was "cocaine base" authorized a sentence of life imprisonment, quite apart from the offense level calculation in the guidelines. *See* 21 U.S.C. § 841(b)(1)(A) (setting maximum sentence for violation involving 50 grams or more of "cocaine base" at life imprisonment). While the definition of "cocaine base" in the sentencing guidelines is somewhat narrower than this Circuit's interpretation of the same term in the statute, *see United States v. Palacio*, 4 F.3d 150, 154–55 (2d Cir.1993); *see also United States v. Jackson*, 968 F.2d 158, 161–63 (2d Cir.1992)(construing "cocaine base" in § 841(b)(1)(A) according to its scientific definition: "a substance which when combined with an acid produces a salt"), it is the *statutory* definition which controls the determination of the potential *statutory* maximum.[11] Because it was the jury's finding that Snow was guilty of crimes involving "cocaine base" that subjected him to the statutory maximum of life imprisonment, there was no Sixth Amendment infirmity with the district court finding that the "cocaine base" was in fact "crack cocaine," since this finding did not permit a higher statutory maximum. *See United States v. Holguin*, 436 F.3d 111, 117–19 (2d Cir.), *cert. denied,* —— U.S. ——, 126 S.Ct. 2367, 165 L.Ed.2d 290 (2006).

■ Lastly, Marcus Snow argues that the district court's retroactive application of *United States v. Booker*, 543 U.S. 220,

---

**10.** Despite recognizing *Estrada* as binding precedent, Snow asks us to reconsider it in light of *Shepard v. United States*, 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) (defining what sentencing court could look to in determining whether prior conviction triggered enhanced sentencing under Armed Career Criminal Act). In *Estrada* we rejected a similar *Shepard*-based argument, and we do so again for the reasons stated there. 428 F.3d at 390–91.

**11.** Because a prior decision of a panel of this court binds all subsequent panels "absent a change in law by higher authority or by way of an in banc proceeding," *United States v. King*, 276 F.3d 109, 112 (2d Cir.2002), we reject Snow's invitation to reconsider the interpretation of "cocaine base" we announced in *Jackson*.

125 S.Ct. 738, 160 L.Ed.2d 621 (2005), violates the *ex post facto* principle of the Constitution.[12] Specifically, Snow argues that he was entitled to the benefit of *Booker*, meaning that the district court could apply the now-advisory guidelines and consider the factors listed in 18 U.S.C. § 3553(a) to impose a sentence lower than the applicable guidelines range, but is protected under *ex post facto* principles from a sentence greater than that which he would have received under the pre-*Booker* mandatory guidelines range.

We rejected a similar argument in *United States v. Fairclough*, 439 F.3d 76, 78–79 (2d Cir.) (per curiam), *cert. denied*, —— U.S. ——, 126 S.Ct. 2915, 165 L.Ed.2d 937 (2006). There, we upheld a district court's retroactive application of *Booker's* remedial holding, reasoning that the defendant "had fair warning that his conduct was criminal, that enhancements or upward departures could be applied to his sentence under the Guidelines based on judicial fact-findings, and that he could be sentenced as high as the statutory maximum...." *Id.* at 79; *see also Holguin*, 436 F.3d at 119–120 (holding that retroactive application of *Booker* to cases on direct review did not violate *ex post facto* principles). As Snow's *ex post facto* argument is foreclosed by circuit precedent, it does not warrant relief from his sentence.

## II. RAHAD ROSS

 Rahad Ross contends there was insufficient evidence to support his convictions on Counts I, V and VI.[13] While we review a challenge to the sufficiency of the evidence *de novo*, a defendant seeking to overturn his conviction on this ground bears a heavy burden. *United States v. Naiman*, 211 F.3d 40, 46 (2d Cir.2000). "We consider the evidence presented at trial 'in the light most favorable to the government, crediting every inference the jury might have drawn in favor of the government.'" *Id.* Direct evidence is not required to make out a submissible case; indeed, the government's case may rest solely on circumstantial evidence. See *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir.2004). So long as *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the jury's guilty verdict will withstand a challenge to its legal sufficiency. See *United States v. Jones*, 393 F.3d 107, 111 (2d Cir.2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

Viewed in the light most favorable to the government, the evidence at trial relevant to Ross's convictions was as follows. Donnie Brown, the confidential informant who conducted the controlled buys, testified that he had purchased cocaine in half-

**12.** Although Snow specifically contends that the retroactive application of *Booker* violates the *Ex Post Facto* Clause of the Constitution, Art. I § 10, we read his argument to be premised on the *ex post facto* limitations on judicial decisionmaking inherent in the notion of due process, since the *Ex Post Facto* Clause of the Constitution is a limitation on the retroactive application of *legislation*, and therefore, does not apply to the courts. *See Rogers v. Tennessee*, 532 U.S. 451, 457–460, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001).

**13.** Count I charged Ross with conspiracy to possess with intent to distribute and to dis-

tribute 50 grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846. Count V charged that Ross possessed with intent to distribute 50 grams or more of cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). Count VI charged him with unlawfully keeping a premises for the purpose of distributing and using cocaine base between September 1, 2001 and January 11, 2002 in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2. (MS App. 42) Ross does not contest his conviction on Count II for distributing cocaine base in violation of 21 U.S.C. § 841(a)(1).

ounce and one-ounce quantities from Marcus Snow in 1999, and that Ross was present during some of those transactions. Later, during the October 2, 2001 controlled buy, when Brown was ordering drugs from Marcus Snow in front of the 183 Sixth Street residence, he saw Ross on the porch at the 190 Sixth Street residence. When Brown went inside 190 Sixth Street he found Ross playing a videogame with Ronnie Parsons, and Brown asked them for an eight-ball of crack cocaine. In response, Ross handed Fred Snow a key; Snow left out the back door, only to return a minute or two later with an eight-ball of cocaine as Brown had requested.

Unindicted co-conspirator Marzell Miller testified that in 2001 he was selling eight-balls of crack cocaine that he bought almost exclusively from Ross. Sometime in the spring of 2001, Ross had told Miller to come to Sixth Street to buy crack cocaine from him; he also showed Miller the pistol he carried. From that point on, during the summer of 2001 until December, Miller would go to 190 Sixth Street once a week to get at least an eight-ball of crack cocaine from Ross on each visit, and a quarter-ounce of crack on at least one occasion.

Sherman Green, an unindicted coconspirator, testified that Ross was present during at least two drug deals between Green and Marcus Snow at 183 Sixth Street during 1999. On one of these occasions, Snow was cooking crack in the kitchen, with baggies of crack cocaine lying around and a handgun on the living room table. Ross was also with Snow during a number of cocaine deals with Green in front of a shoe store between July and December 2000. Green also testified that Ross was also present on occasions when Green bought drugs at Todd Snow's apartment.

Ron Keitt, a second cooperating witness, also testified that Ross was present during drug transactions with Marcus Snow. From late 1998 to the end of 1999, Keitt saw Ross riding in the passenger seat of Marcus Snow's car on several occasions when Keitt was buying crack cocaine from Snow. On a weekly basis from August or September of 2000 until the beginning of 2001, Keitt bought crack cocaine from Snow in varying quantities greater than one ounce, and Keitt saw Ross with Snow during several of these transactions. Ross was also present during Keitt and Snow's twice-weekly transactions at 190 Sixth Street during the late summer of 2001; Keitt testified that Ross stood by and watched as Snow would retrieve between two and four ounces of narcotics from the apartment next door and hand it over to Keitt in exchange for cash.

Oliver Jackson, the owner and landlord of 183 Sixth Street, testified that in September 2001, Marcus Snow contacted him about renting the apartment at 183 Sixth Street. Later that day, Ross and Snow came to see the apartment, and Jackson showed them around. It was Jackson's understanding that both of them wanted to rent the two-bedroom apartment. Although Jackson did not prepare a formal lease, Ross filled out a rental application for the apartment, and after he did so, Jackson asked for Ross's driver's license to verify his identity. Snow did not put his name on the application. Ross paid the $475 security deposit, while Snow paid the first month's rent, also $475. Later, Jackson gave Snow two sets of keys to the apartment: one for Snow and one for Ross. Jackson saw the two moving into the apartment in September. Jackson collected rent from both Ross and Snow: Ross in October and Snow for the next three months. When Jackson went to check on the house and to collect rent he would see Snow, Ross, and their friends inside the apartment.

On January 11, 2002 members of the Rochester Police Department executed a search warrant at the three properties on Sixth Street. After they entered 183 Sixth Street and announced that they were police, a black man jumped out a front window and onto the lawn; shortly thereafter officers apprehended two black men running from the rear of the house, neither wearing a coat, and one without shoes. One of the men was Rahad Ross. An accompanying search of the residence, uncovered several small scales, plastic baggies, plastic balloons, and trace amounts of cocaine in the kitchen, as well as photographs on the top of a dresser in the bedroom next to the kitchen depicting Ross and Snow. The officers found two loaded handguns inside the dresser next to $6,000 in cash. In the basement of the apartment, police found 180 baggies containing approximately 474 grams of crack cocaine.

## A. INSUFFICIENT EVIDENCE: CONSPIRACY

The jury found Ross guilty of conspiracy to possess with intent to distribute and to distribute 50 grams or more of cocaine base. "In cases of conspiracy, deference to the jury's findings 'is especially important ... because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.' " *Morgan*, 385 F.3d at 204 (quotation omitted); *see also United States v. Mulder*, 273 F.3d 91, 109 (2d Cir.2001) ("We must be especially deferential when reviewing a conspiracy conviction" for legal sufficiency).

 "To be guilty of conspiracy, 'there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and par-

ticipated in it.' " *Morgan*, 385 F.3d at 206 (quoting *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir.1984)); *Jones*, 393 F.3d at 111. Ross argues that the evidence was insufficient because the government proved no more than his periodic presence during several drug sales, and this falls short of proving his knowledge of the conspiracy and his intent to participate in it. It is axiomatic that "mere presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in [a] conspiracy," *United States v. Samaria*, 239 F.3d 228, 235 (2d Cir.2001), nor is evidence of "suspicious circumstances," standing alone, sufficient. See *Jones*, 393 F.3d at 111. However, where the government presents evidence tending to show "that the defendant was present at a crime scene under circumstances that logically support an inference of association with the criminal venture," a reasonable juror could conclude the defendant was a knowing and intentional criminal conspirator. *United States v. Eltayib*, 88 F.3d 157, 171 (2d Cir.1996).

To be sure, while Sherman Green, Ron Keitt, and Donnie Brown testified that Ross accompanied Marcus Snow during numerous multi-ounce crack cocaine transactions from late 1998 until 2001 in and around the apartments on Sixth Street, none claimed that they actually purchased any drugs from Ross. Thus, Ross is correct that, standing alone, this evidence of "mere presence" at the scene of a drug transaction or "mere association" with a drug dealer, is insufficient for a reasonable jury to find beyond a reasonable doubt that Ross knowingly and intentionally participated in the charged conspiracy. See *Jones*, 393 F.3d 107, 111–12; *Samaria*, 239 F.3d at 235–36.

However, this evidence was not standing alone; there was also evidence that Ross

personally participated in several of the drug sales occurring during the period of the charged conspiracy. Moreover, the circumstances surrounding Ross and Marcus Snow's joint rental of the 183 Sixth Street apartment, where the bulk of the paraphernalia and narcotics involved in the conspiracy were discovered, further supports the jury's conclusion that Ross was a knowing and intentional conspirator. Finally, Ross's presence at the apartment during the raid was "under circumstances that logically support an inference of association with the criminal venture," as he was caught fleeing, shoeless and coatless in the middle of January, from an apartment in which officers found drug paraphernalia, loaded firearms, $6,000 in cash, and approximately 474 grams of cocaine base packaged and stored in saleable quantities stashed in the basement. *Eltayib*, 88 F.3d at 171; see also *United States v. Benitez*, 920 F.2d 1080, 1089 (2d Cir.1990) (rejecting insufficiency claim where defendant jumped out of the window of an apartment where narcotics, weapons, and other evidence of ongoing narcotics operation were found).

The combination of this evidence, construed in the light most favorable to the government, supported submitting the conspiracy charge to the jury. *See United States v. Nusraty*, 867 F.2d 759, 764 (2d Cir.1989) ("pattern of acts ... reflecting the defendant's participation in a criminal scheme" could support submissibility). Although, as Ross argues, a reasonable juror may have reached a contrary conclusion, such matters are appropriately argued to the jury and are not grounds for reversal on appeal. *Benitez*, 920 F.2d at 1089–90. Accordingly, we affirm Ross's conspiracy conviction.

## B. INSUFFICIENT EVIDENCE: POSSESSION

 Ross also argues that there was insufficient evidence from which a rea-sonable juror could find beyond a reasonable doubt that he *possessed* the cocaine base found in the basement of 183 Sixth Street, a finding which was necessary to support his conviction for possession of cocaine with the intent to distribute. "Possession with intent to distribute narcotics may be established by proof of the defendant's actual or constructive possession of the narcotics." *United States v. Gordils*, 982 F.2d 64, 71 (2d Cir.1992). "To establish constructive possession, the government must demonstrate that [Ross] had 'the power and intention to exercise dominion and control over'" the cocaine base found at 183 Sixth Street. *United States v. Rodriguez*, 392 F.3d 539, 548 (2d Cir.2004) (quoting *United States v. Payton,* 159 F.3d 49, 56 (2d Cir.1998)). The defendant's dominion and control over the contraband need not be *exclusive. Morgan*, 385 F.3d at 207; see also *Eltayib*, 88 F.3d at 172 ("Dominion and control of contraband, either exclusively or in association with others, are sufficient to prove possession."). Although "mere presence at the location of contraband does not establish possession," *Rodriguez*, 392 F.3d at 548, we have held that "presence under a particular set of circumstances" from which a reasonable jury could conclude that the defendant constructively possessed contraband located there would support a conviction. *United States v. Soto*, 959 F.2d 1181, 1185 (2d Cir.1992) (rejecting insufficiency claim where defendant was present at apartment containing three separate crack packaging stations and without money to support argument that he was there as a "mere purchaser."); *see also United States v. Benitez*, 920 F.2d 1080, 1089 (2d Cir.1990) (rejecting insufficiency claim where defendant jumped out of the window of an apartment where narcotics, weapons, and other evidence of an ongoing narcotics operation were found).

Much of the same circumstantial evidence supporting Ross's conspiracy conviction also supported submissibility of the substantive possession charge. First, witnesses testified to purchasing crack cocaine from Ross at 190 Sixth Street, where other witnesses purchased crack cocaine from the Snow brothers and their associates, and still other witnesses testified that Ross accompanied Marcus Snow during crack cocaine and cocaine transactions at both 183 Sixth Street and 190 Sixth Street. More importantly, the landlord of 183 Sixth Street testified to renting the apartment to Ross, giving him a set of keys, seeing him move in, and seeing him there on the landlord's visits to the apartment. Lastly, the police found Ross, present at 183 Sixth Street under circumstances providing ample grounds for a reasonable jury to conclude that he exercised dominion or control over the cocaine base found there, since he was fleeing the premises without shoes and a coat in January, in Rochester, New York. *See Soto,* 959 F.2d at 1185; *Benitez,* 920 F.2d at 1089.

The evidence in *Rodriguez,* which reversed convictions for both conspiracy to distribute and possession on insufficiency grounds, provides a useful contrast to the instant case. 392 F.3d 539. There, the only evidence linking the defendant to any drug trafficking was that he had been seen surveying a parking lot shortly before a drug transaction there; drugs were found in the back seat of his car, hidden inside a box and wrapped in two bags; and the defendant may have been in the back seat of the car at some point while the drugs were there. *Id.* at 548–49. We held that the government had presented no evidence the defendant knew that he was conducting surveillance in order to facilitate a

drug deal, that he knew such a drug deal had even occurred, or that he exercised dominion or control over the drugs found in the back seat of his car. *Id.* Accordingly, we concluded that a reasonable juror could not have found beyond a reasonable doubt that Rodriguez exercised dominion or control over the drugs in the car.

The evidence of constructive possession here is much stronger than that in *Rodriguez.* While there was no evidence the Rodriguez defendant was involved in any drug trafficking, there was ample evidence of Ross's involvement in numerous drug transactions occurring in and around the Sixth Street apartments. Multiple witnesses testified to Ross's possession and distribution of crack cocaine, his involvement with the Snow brothers in the possession and distribution of crack cocaine, and his presence during drug transactions involving multiple ounces of crack cocaine at 183 Sixth Street. Viewed in this context, Ross's presence at and flight from 183 Sixth Street at the time of the raid as well as the circumstances surrounding the rental of the apartment, provided sufficient evidence from which a jury could find that he constructively possessed the crack cocaine found in the apartment's basement.

## C. INSUFFICIENT EVIDENCE: MAINTAINING DRUG PREMISES

■ Lastly, Ross challenges his conviction for opening and maintaining the premises at 183 Sixth Street for the purpose of distributing and using cocaine base between September 1, 2001 and January 1, 2002 in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2.[14] To convict, "the gov-

---

14. By not differentiating between the two subsections of 18 U.S.C. § 2, Count VI charged Ross as both principal and an aider and abetter; thus, the government could convict with

proof that Ross acted as a principal. *See United States v. Knoll,* 16 F.3d 1313, 1322–23 (2d Cir.1994); *see also United States v. Becerra,* 97 F.3d 669, 672 (2d Cir.1996) (discussing

ernment was required to establish beyond a reasonable doubt that the defendant (1) opened or maintained a place; (2) for the purpose of distributing or packaging controlled substances; and (3) did so knowingly." *United States v. Becerra*, 97 F.3d 669, 672 (2d Cir.1996) (citation omitted); *see also United States v. Hamilton*, 334 F.3d 170, 180–81 (2d Cir.2003) (discussing elements of § 856(a)(1) offense). Conceding that the 183 Sixth Street apartment was being used for the distribution and use of cocaine base and that he was aware of such use, Ross focuses his argument on the alleged inadequacy of the government's proof that he, as opposed to Marcus Snow, "opened or maintained" the premises.

Viewed in the light most favorable to the jury's verdict, we conclude that there was sufficient evidence from which a rational juror could conclude beyond a reasonable doubt that Ross "opened or maintained" the apartment at 183 Sixth Street, even if the jury could conclude that Marcus Snow did the same. Oliver Jackson, the owner and landlord, testified that he showed the two-bedroom apartment at 183 Sixth Street to Ross and Marcus Snow together and that he provided a set of keys for both of them. Ross filled out the rental application and paid the $475 security deposit; while Snow paid the $475 for the first month's rent, Jackson collected the October rent from Ross. Jackson saw both of them moving in and saw both of them inside the apartment on occasions when he visited the premises. Furthermore, when officers raided the apartment, they observed Ross and another male fleeing the premises, neither wearing a coat, and one without shoes. Inside, officers found photographs depicting Ross and Snow in close

proximity to drug paraphernalia and what a jury could conclude were drug proceeds.

In response to this evidence, Ross points to the lack of any testimony that he participated in any drug sales at 183 Sixth Street during the time period charged or that he personally possessed any controlled substances or contraband when police arrested him at the apartment. He also points to the absence of physical evidence linking him to the residence, coupled with evidence suggesting that he was not responsible for the apartment, including his driver's license listing a different address and the stipulation that his mother would testify that he did not live at 183 Sixth Street. He claims that these evidentiary deficiencies preclude a jury finding beyond a reasonable doubt that he was responsible for the opening and maintenance of the crack house at 183 Sixth Street.

We reject Ross's initial argument because neither the sale of narcotics nor the possession of such are elements of the instant offense, so long as the premises were being maintained for one of the forbidden purposes, which Ross does not contest. *See Hamilton*, 334 F.3d at 180. Nor is evidence required that Ross actually lived at the premises; all that is required is that he have "opened or maintained" it. See *Becerra*, 97 F.3d at 672;21 U.S.C. § 856(a)(1). Likewise, we reject Ross's second argument, which essentially asks us to re-weigh the evidence presented at trial, since such weighing is the province of the jury, and not of this court. See *Morgan*, 385 F.3d at 207. While the evidence presented here was not as overwhelming as that put on by the government in other § 856(a)(1) prosecutions we have reviewed,

relationship between principal and accomplice liability under 18 U.S.C. § 2 in reviewing conviction under 21 U.S.C. § 856(a)(1)).

see *Becerra,* 97 F.3d at 672, it was sufficient to submit the charge to the jury.

## III. FRED SNOW

■ In his sole point on appeal, Fred Snow challenges the district court's offense-level calculation with respect to the quantity of cocaine base the court attributed to him. He argues that the district court erred by finding him responsible for the 612 grams seized during the raid on 183 Sixth Street because there was insufficient evidence connecting him to the residence.

"When addressing a claim that there was insufficient evidence to support a district court's drug quantity finding, we are mindful that the district court 'has broad discretion to consider all relevant information' and the 'quantity determination will not be disturbed unless it is clearly erroneous.'" *United States v. Richards,* 302 F.3d 58, 70 (2d Cir.2002) (quotation omitted). "To reject a finding of fact as clearly erroneous, we must, upon review of the entire record, be 'left with the definite and firm conviction that a mistake has been committed.'" *United States v. Garcia,* 413 F.3d 201, 222 (2d Cir.2005).

■ A defendant convicted for a "jointly undertaken criminal activity" such as the instant drug trafficking conspiracy, may be held responsible for "all reasonably foreseeable acts" of others in furtherance of the conspiracy. U.S.S.G.

§ 1B1.3(a)(1)(B) (2002); *United States v. Johnson,* 378 F.3d 230, 238 (2d Cir.2004). The defendant need not have actual knowledge of the exact quantity of narcotics involved in the entire conspiracy; rather, it is sufficient if he could reasonably have foreseen the quantity involved. *See id.* Ultimately, the question is whether the conspiracy-wide quantity was within the scope of the criminal activity the defendant agreed to and whether the activity in question was foreseeable to the defendant. *See United States v. Mulder,* 273 F.3d 91, 118 (2d Cir.2001) (quoting *United States v. Studley,* 47 F.3d 569, 574 (2d Cir.1995)).

Here, there was sufficient evidence for the sentencing court to answer both questions in the affirmative and find Snow responsible for cocaine base found at 183 Sixth Street. The evidence at trial, upon which the district court relied, demonstrated to the jury beyond a reasonable doubt that Fred Snow was involved in a conspiracy to distribute cocaine base out of the three apartments on Sixth Street. Based on the testimony of unindicted co-conspirators and the confidential informant regarding Fred Snow's involvement in specific drug trafficking transactions at 190 Sixth Street during the weeks leading up to the raid on the three apartments,[15] the court could conclude that the cocaine base, stored and packaged in saleable quantities at 183 Sixth Street, was within the scope of the criminal activity Snow agreed to and was reasonably foreseeable to him.[16] Giv-

---

15. Marzell Miller testified that he bought cocaine base in eight-ball quantities from Fred Snow on at least two occasions during the summer and fall of 2001. Likewise, Fred Snow was involved in three out of four of the controlled buys at 190 Sixth Street during the fall of 2001. In one buy, Donnie Brown specifically asked Fred Snow for an eight-ball of cocaine, and then Snow fetched the desired quantity from 188 Sixth Street. During another buy, Brown ordered an eight-ball of crack from Fred Snow, Marcus Snow and

others that were gathered on the sidewalk in front of 183 Sixth Street; while Marcus Snow went inside 183 Sixth Street, Fred Snow went to 190 Sixth Street to fill the order. During another buy, Brown ordered an eight-ball of cocaine directly from Fred Snow.

16. Nor, as Snow argues, is there any inconsistency between the jury's finding that he was responsible for between five and 50 grams of cocaine base and the district court's finding that he was responsible for 643.5 grams of

en the evidence before it at trial, the district court's finding by a preponderance of the evidence that the cocaine base stored at 183 Sixth Street was attributable to Fred Snow was not clearly erroneous. *See Richards,* 302 F.3d at 70.

## V. JUDGMENT

We affirm the judgments and sentences.

Judge POOLER dissents in part in a separate opinion.

POOLER, Circuit Judge, concurring in part and dissenting in part.

While I agree with almost all of the majority opinion, I would find that the government presented insufficient evidence to support the conviction of Rahad Ross for possession of the cocaine found in the basement of 183 Sixth Street. Because I believe this case is not distinguishable from *United States v. Rodriguez,* 392 F.3d 539 (2d Cir.2004), I would follow our decision in that case and find insufficient evidence to support a theory of constructive possession. For this reason, I respectfully dissent from Part II–B of the majority opinion.

As the majority agrees, because there was no evidence that Ross actually physically possessed the cocaine, the government had to establish that he constructively possessed it. *See United States v. Teague,* 93 F.3d 81, 84 (2d Cir.1996). This requires the government to show that Ross " 'knowingly [had] the power to and the intention at [the] time to exercise dominion and control' over the cocaine." *Id.* (quoting *United States v. Hastings,* 918 F.2d 369, 373 (2d Cir.1990)). "[M]ere presence at the location of contraband

does not establish possession." *Rodriguez,* 392 F.3d at 548.

Although the majority is correct that "presence under a particular set of circumstances" may be enough if those circumstances provide the jury with a reasonable basis to conclude the defendant exercised dominion and control over the cocaine, the circumstances here fall far short of those we have previously approved as sufficient to demonstrate constructive possession. *Cf. United States v. Soto,* 959 F.2d 1181, 1185 (2d Cir.1992). In fact, they are much more analogous to circumstances in which we have found the evidence of constructive possession insufficient. *See Rodriguez,* 392 F.3d at 548–49.

In *Rodriguez,* we reversed a conviction for possession where the drugs were hidden in the backseat of the defendant's car and he may have been in the backseat of the car shortly beforehand. *Id.* There are several factual similarities between *Rodriguez* and this case: the drugs were (1) hidden, (2) in a location over which the defendant may have had some control, (there his car, here an apartment he had rented), and (3) where the defendant had been shortly before the drugs were found (or at least his presence could be reasonable inferred). Based on *Rodriguez,* I would find we are compelled to conclude that presence at the location of hidden drugs, even when there is evidence that location is partially under the defendant's control, is insufficient to support constructive possession.

Although the majority attempts to distinguish *Rodriguez* because there was no evidence that Rodriguez was involved in any drug trafficking, whereas here, there was ample evidence of Ross' involvement in a drug conspiracy, Ross' involvement in

cocaine base, which included the 612 grams seized from 183 Sixth Street, since the former is governed by a reasonable doubt standard, while the court may find the latter by a mere

preponderance of the evidence. *Garcia,* 413 F.3d at 220 n. 15 ("Judicial authority to find facts relevant to sentencing by a preponderance of the evidence survives *Booker.*").

the conspiracy does not lessen the government's obligation to show possession of the specific drugs at issue. While Ross may be vicariously liable for these drugs as part of the conspiracy, a conviction for possession requires a more direct connection between the defendant and the drugs- he must have exercised dominion and control over them. Where, as here, the drugs are hidden, common sense dictates that this must involve at least some evidence that Ross knew the drugs were there. There was no such evidence here.[17]

By contrast, in *Soto*, we upheld a conviction for possession of cocaine based on defendant's presence in the apartment where the drugs were found because there were three cocaine packaging stations in operation in the apartment and three people, including the defendant, were found there. Unlike in *Rodriguez*, the drugs were not hidden but were out in plain view at the time of the search. 959 F.2d at 1185; *see also United States v. Gordils*, 982 F.2d 64, 71–72 (2d Cir.1992) (upholding conviction for possession where defendant was the only person present in the apartment and drugs were in plain view).[18] Because the drugs here were hidden rather than in plain view, expanding constructive possession to encompass the facts of this case requires an extension of our caselaw, and one that I believe is unwarranted.

For the foregoing reasons, I respectfully dissent from Section II–B of the majority opinion.

---

**17.** Knowledge of the presence of hidden drugs cannot reasonably be inferred from Ross' flight from the apartment because that flight could have been for any number of reasons, including his knowledge that drug paraphernalia would be found there or simple fear of the police.

---

**18.** The majority also relies on *United States v. Benitez*, 920 F.2d 1080, 1089 (2d Cir.1990), but the discussion of sufficiency in that case focuses almost entirely on the conspiracy and distribution, not constructive possession. *Id.* at 1088–89.